**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

PRASAD V. POTLURI,

               Plaintiff/Counter-Defendant,        Case Number: 06-13517

v.                                  JUDGE PAUL D. BORMAN
                                  UNITED STATES DISTRICT COURT

SATISH YALAMANCHILI,

               Defendant/Counter-Plaintiff,

and

CLAUDINE GEORGE and ICONMA, LLC, a
Michigan limited liability company,

               Defendants.
_____ /

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANTS'
MOTION TO DISMISS AND GRANTING PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT**

      Before the Court are the following motions: (1) Defendants Iconma, LLC and Claudine

George's April 18, 2008 Motion for Summary Judgment and Motion to Dismiss (Doc. No. 91); (2)

Defendant Satish Yalamanchili's April 18, 2008 Motion for Summary Judgment (Doc. No. 92); and

(3) Plaintiff Prasad V. Potluri's April 18, 2008 Motion for Summary Judgment on Yalamanchili's

counterclaim (Doc. No. 93). The Court held a motion hearing on October 16, 2008. For the reasons

that follow, the Court GRANTS IN PART and DENIES IN PART Iconma and George's motion for

summary judgment, DENIES Iconma's motion to dismiss, GRANTS IN PART and DENIES IN

PART Yalamanchili's motion for summary judgment, and GRANTS Plaintiff's motion for summary judgment.

## I. BACKGROUND

This case arises from a dispute between two individuals, formerly friends and business partners, concerning the ownership interests in several different companies each either started independently or together.

According to Plaintiff Prasad V. Potluri ("Plaintiff"), in 1996, he and Defendant Satish Yalamanchili ("Yalamanchili") entered into an agreement to pursue various business ventures. (Compl. ¶ 11). The terms of the agreement were as follows: unless one of the parties opted out, or specifically elected not to participate in a business venture, Plaintiff and Yalamanchili would each have an equal fifty percent share in the business venture, irrespective of the legal form of the business or the legal owner of record, and share the profits and losses equally. (Id.) The agreement was never reduced to writing.

During March 1996, Plaintiff established a company called Procon, Inc., which provided IT consulting services (Potluri Dep. 32). From 1998 until 2000, Procon was located in the First Office Center in Southfield, Michigan. (Potluri Dep. 53). According to Plaintiff, in June 1996, Yalamanchili and he agreed to work together in promoting Procon. (Potluti Dep. 59). Plaintiff was initially listed as 100% owner of Procon. (Potluri Dep. 59). In 1997, Plaintiff has his lawyer draw up papers to give Yalamanchili fifty percent ownership of Procon, but it is unclear whether those documents were ever executed. (Iconma Br. Ex. C, Kaufman File).

In 1998, Procon was sold to a company called RCM. (Potluri Dep. 77). Under the terms of the purchase, RCM paid Plaintiff $11.5 million. (Compl. ¶ 13). Plaintiff paid $5.75 million, fifty

percent of the purchase proceeds, to Yalamanchili. (Id.) RCM agreed to employ Plaintiff and Yalamanchili, and pay them an earn-out bonus if the Procon unit of the business achieved certain target sales. (Potluri Dep. 77). On November 24, 1998, Plaintiff signed a non-compete agreement with RCM for a period of five years. (Potluri Dep. 55-56; Iconma Br. Ex. D, Non-Compete Agreement). Yalamanchili was not required to sign a non-compete. (Potluri Dep. 322; Yalamanchili Dep. 220-21). During August 1999, Plaintiff testified that Yalamanchili and he were attempting to get their earn-out bonuses, but also looking at other business opportunities. (Potluri Dep. 77).

In early 2000, a New Jersey-based banker named Robert Murphy identified for Plaintiff an Atlanta-based business called Albion International that among other things focused upon providing e-business solutions to government. (Potluri Dep. 80). Plaintiff set up a company called Karvy Solutions with several other investors to acquire Albion. (Potluri Dep. 94). Karvy purchased Albion, and then another company called Orion Consulting. (Potluri Dep. 388-89). Eventually, Karvy was renamed Albion Orion Company LLC. (Potluri Dep. 389).

In March 2000, according to Plaintiff, he and Yalamanchili discussed the formation of a new company called Iconma. (Potluri Dep. 144). Plaintiff testified that they agreed that Yalamanchili would take the lead in forming the company, and Plaintiff would work on Albion Orion, because the two did not want to imperil the RCM earn-out payments by possibly violating the non-compete agreement. (Potluri Dep. 324-25, 470-71). Plaintiff stated that he and Yalamanchili agreed to share equal ownership of Iconma. (Potluri Dep. 144). Plaintiff testified that Defendant Claudine George ("George")[1] was not involved in any of the discussions surrounding the formation of Iconma. (Potluri Dep. 121). Plaintiff further testified that they agreed to falsely list George as the owner and

_____

[1] Claudine George is Yalamanchili's wife. (Compl. ¶ 1).

CEO of Iconma. (Potluri Dep. 325-26). Plaintiff represented that he came up with the idea for the name "Iconma," because it signified "information consulting management," comprised six letters like Procon, and the internet domain name was available. (Potluri Dep. 374-75).

Yalamanchili and George told a remarkably different version of the events surrounding the formation of Iconma. After starting an IT staffing firm called Computer Systems Group ("CGS") in 1999, George decided to start another company in early 2000. (George Dep. 50, 81). George testified that she formed Iconma, which provides IT staff and does software development. (George Dep. 91-93). George testified that she contacted an attorney at Bodman, Longley & Dahling to assist her in forming Iconma, LLC. (George Dep. 87-88). On April 14, 2000, George signed Iconma's Michigan LLC articles of incorporation. (Iconma Br. Ex. G, Articles). George was listed as the LLC's sole member, and the address was listed on Franklin Road in Southfield, Michigan. (Iconma Br. Ex. G, Operating agreement). In Iconma's operating agreement adopted on June 8, 2006, George was listed as the sole member, and stated that her capital contribution to the company was $700,000. (Id.) George testified that she, Yalamanchili, and Yalamanchili's cousin, DK, invested, or loaned money to, Iconma. (George Dep. 102-103). Yalamanchili testified that George established Iconma and, after he left RCM, he went to work for Iconma and George's other company CGS. (Yalamanchili Dep. 192-193).

Plaintiff was never listed as a shareholder of the LLC, and never invested any money directly in Iconma. (Potluri Dep. 121-24, 161). Plaintiff admitted that he was never involved in the day-to-day business of Iconma, and only visited its Troy, Michigan offices "minimal times." (Potluri Dep. 174-75). Defendants point out that in an interrogatory response dated July 17, 2004, during an unrelated lawsuit, Plaintiff indicated that the only companies that he had worked for or had an

interest in were Vision Systems Group, Inc. and Karvy. (Iconma Br. Ex. M, Interrogatory Answer). Significantly, an April 26, 2000 letter from Linda M. Foster, an attorney with Bodman, Longley & Dahling LLP, to Yalamanchili regarding Iconma indicates that Plaintiff and Yalamanchili were, at minimum, involved in the formation of Iconma. (Plaintiff's Ex. 7, Foster letter). The letter states, in relevant part: "At Prasad's request, enclosed is a Certificate of Cancellation for your wife's signature (she was the organizer of the limited liability company)." (Id.) Plaintiff was carbon-copied on the letter. (Id.)

Also, Plaintiff testified that he spent his own resources: (1) flying interview candidates to Michigan to interview with Iconma; and (2) using his Indian offshore team at Maven Corporation to support Iconma's back office. (Potluri Dep. 122-23). Maven's involvement with Iconma included data entry, resume formatting, and other services for about two years, from about late 2002/early 2003 until January 2005. (Potluri Dep. 125, 346, 473). Although Maven billed Iconma for the employee salaries, Plaintiff represented that Maven lost money through its subsidization of Iconma. (Potluri Dep. 127, 345). Iconma employed several former employees of Procon. (Potluri Dep. 169-71). Plaintiff also testified that he arranged consulting services for Iconma, reviewed business proposals Iconma sent to potential clients, set up meetings with potential clients such as Chrysler and also passed along contacts of potential clients for Iconma to pursue. (Potluri Dep. 171-72, 244-45, 462-67; Pl.'s Yalamanchili Resp. Br. Ex. 19). In addition, three of Potluri's business associates testified that he told him that he co-owned Iconma with Yalamanchili. (Murphy Dep.29; Yerneni 15; Chilakapati,80-81).

During 2000, Karvy Solutions was renamed Albion Orion Company. (Potluri Dep. 97). In September 2000, an India-based company named SSI Limited purchased Albion Orion for

$20,000,000 in cash, and $43,000,000 in stock that was distributed to the investors in Karvy Solutions. (Potluri Dep. 98-99). Plaintiff repaid Yalamanchili's initial $1,700,000 investment shortly after the sale, although Yalamanchili was never a shareholder of record. (Potluri Dep. 97-98, 101; Yalamanchili Dep. 223-24). A few weeks later, Plaintiff gave Yalamanchili another $400,000. (Potluri Dep. 98). The rest of the purchase price was distributed among the fifteen or sixteen other investors. (Potluri Dep. 386).[2] By the end of 2001, a downtown in the market depressed the price of the SSI Ltd. stock, and Plaintiff sold the remaining stock, which amounted to less than $2.2 million, and kept the stock proceeds.. (Potluri Dep. 108, 112-114).

Plaintiff testified that because RCM had "defaulted" on its obligation to pay him and Yalamanchili their earn-out bonuses, Yalamanchili began to focus upon building up Iconma in 2000. (Potluri Dep. 97). Plaintiff went to work on increasing the size of Karvy; between March and July 2000, Plaintiff invested about $2,800,000 from the proceeds of the Procon sale into Karvy. (Potluri Dep. 94). Another investor, Dr. Narayanasami invested approximately $4,600,000. (Potluri Dep. 95). Between March and August 2000, Yalamanchili gave $1,700,000, in two installments, to Plaintiff to invest. (Potluri Dep. 95, 140; Yalamanchili Dep. 180, 211-13). Plaintiff testified that he gave Yalamanchili more than 50% of the proceeds of the new company. (Potluri Dep. 96). Yalamanchili testified that he never met anyone from Karvy, Albion, or Orion. (Yalamanchili 217-18).

In the meantime, Plaintiff and Yalamanchili hired counsel and initiated an arbitration proceeding against RCM for failure to pay the earn-outs. (Potluri Dep. 85, 323-24). However, the two decided ultimately to "stall" and then withdraw the lawsuit in order to protect the interests of

---

[2] As of October 3, 2007, the date of Plaintiff's deposition, he admitted that he still owed money to some former shareholders of Albion Orion. (Potluri Dep. 390).

Iconma – i.e., the two did not want RCM going after Iconma on the basis of Plaintiff's potential

violation of his non-compete agreement.  (Potluri Dep. 85-87).

With respect to Iconma's financials, Plaintiff testified that Yalamanchili told him that Iconma

had approximately $15,000,000 or $16,000,000 in sales in 2004.  (Potluri Dep. 153-54).  Plaintiff

stated that he was unaware of Iconma's profits for the years 2001 to 2003, and never saw any of

Iconma's financial statements or tax returns.  (Potluri Dep. 154-55).  Plaintiff did know that Capital

One was one of Iconma's large clients.  (Potluri Dep. 165-66).  Plaintiff testified that he helped

Yalamanchili with an issue that arose with a Ruby Pandit, who had worked for a vendor of Capital

One and was subsequently hired at Iconma.  (Potluri Dep. 166-68).

On January 3, 2005, Yalamanchili sent the following email to Plaintiff:

MavenCorp/Raghavan (I am sure they discussed this with you) have significantly increased their operating expense (not salaries). An advanced notice would have better prepared us but we will pay for it as you guys are running a business and I don't have a problem with it. I already informed Raghavan. We just won't be adding any more new people at this time.

(Iconma Br. Ex. I, 1/05 Emails).

The next day, Plaintiff responded:

As Raghavan would have shared the entire detail with you on costing, Maven already has subsidized, am [sic] approximate of $50K over the last 2 years in supporting Iconma because of my beneficial ownership in Iconma.

Even in the current costing, Maven is still subsidizing. Maven has [sic] changed it's ISP provider to SIFY which has increased the DIRECT costs substantially and Maven is forwarding only direct costs.

(Id.).

On January 7, 2005, George called Plaintiff in response to his email and told him that she

and Yalamanchili owned Iconma, and he had no interest in it.  (Potuluri Dep. 350:22-25; 351:1-25;

352:1-24).

On January 8, 2005, Plaintiff sent a lengthy email to George, carbon-copying attorney Jay Schwartz, explaining the basis for his claim of co-ownership of Iconma. (Iconma Br. Ex. J, 1/8/05 Email).

On November 21, 2005, Plaintiff filed the instant case in the United States District Court for the District of New Jersey. The Complaint asserted the following state law causes of action:

| | |
|---|---|
| Count I: | Breach of Contract |
| Count II: | Promissory Estoppel, Restatement of Contracts § 90 |
| Count III: | Equitable Estoppel |
| Count IV: | Fraud/Civil Conspiracy |
| Count V: | Conversion |
| Count VI: | Unjust Enrichment.[3] |

On January 30, 2006, Defendants moved under Fed. R. Civ. P. 12(b)(6), to dismiss for lack of personal jurisdiction, and to transfer venue to the Eastern District of Michigan. On July 28, 2006, the New Jersey district court denied Iconma's motion to dismiss for failure to state a claim, granted Defendants' motion to transfer venue, and indicated that it did not need to reach the personal jurisdiction issue. *See Potluri v. Yalamanchili*, No. 05-5494, 2006 U.S. Dist. LEXIS 95644 (D.N.J. July 28, 2006) (unpublished). On March 5, 2007, the district court denied Plaintiff's motion for reconsideration on the venue issue. *See Potluri v. Yalamanchili*, No. 05-5494, 2007 WL 708908, *3 (D.N.J. Mar. 5, 2007) (unpublished). On August 4, 2006, this Court received the record from the New Jersey action.

On September 5, 2006, Defendant Yalamanchili filed the following Counter-Claims against Plaintiff:

| | |
|---|---|
| Count I: | Breach of Contract |

---

[3] The parties agree that the Court should apply Michigan law to the instant dispute.

Count II:       Breach of Contract as to Albion Orion Company
Count III:      Fraud
Count IV:       Conversion.

On April 18, 2008, all parties filed motions for summary judgment. (Doc. Nos. 91, 92, 93). The parties filed the appropriate Reponses. On May 21, 2008, the parties stipulated to the dismissal of Counts II-IV of Yalamanchili's counterclaim.

## II. ANALYSIS

### A.       Standard for Summary Judgment

The United States Court of Appeals for the Sixth Circuit has summarized the standard for summary judgment as follows:

> Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. "The judge is not to weigh the evidence and determine the truth of the matter, but rather determine whether there is a genuine issue for trial."

*Totes Isotoner Corp. v. Int'l Chemical Workers Union Council/UFCW Local 664C*, 532 F.3d 405, 411-12 (6th Cir. 2008) (internal citations omitted).

### B.       Potluri's Claims

Yalamanchili and George move for summary judgment on all of Plaintiff's claims on the following grounds: (1) the unclean hands doctrine bars the claims to the extent that Iconma was formed in violation of Plaintiff's non-compete agreement with RCM; (2) the alleged contract fails for indefiniteness; (3) the alleged contract is void for violating public policy; (4) the alleged contract does not comply with the statute of frauds; (5) the alleged contract violated the Michigan LLC Act; (6) there can be no promissory estoppel (implied contract) where Plaintiff alleges the existence of an express contract; (7) the unjust enrichment claim only applies to Inconma, and not Yalamanchili;

(8) Michigan law does not recognize a cause of action for "equitable estoppel"; (9) there is no factual basis for a fraud/civil conspiracy claim; and (10) there is no factual basis for a conversion claim.

1.     Unclean Hands

Defendants argue that the "unclean hands" (or "clean hands") doctrine bars Plaintiff's claims based upon the following allegedly fraudulent conduct: (1) violating his non-compete agreement with RCM and trying to hide that fact by setting up Iconma in George's name; (2) failing to honor his financial obligations to Dr. Narayanasami as part of the AlbionOrion venture; (3) Plaintiff failed to identify any interest in Iconma in an interrogatory response in the Narayanasami litigation; and (4) failing to disclose his alleged ownership interest in Iconma to the IRS.

Plaintiff responds that: (1) the unclean hands doctrine only applies in equity, and not in actions at law (Counts I, IV, and V); (2) RCM materially defaulted on its obligations to Plaintiff in providing the $2 million earn-out compensation, thus freeing Plaintiff from the non-compete; and (3) Yalamanchili actually installed George as the sole member of Iconma, at the recommendation of Plaintiff.

The Michigan Supreme Court has addressed the doctrine of "unclean hands" in the context of a case in equity involving a "shill bidder" scheme:

> Given improper conduct by [the plaintiff], plaintiffs' equitable claims of fraud and misrepresentation are barred by the bedrock principle that the preservation of the integrity of the judicial system means no court acting in equity can allow its conscience to be moved to give such a plaintiff relief. Indeed, the maxim that one "who comes into equity must come with clean hands" is "the expression of one of the elementary and fundamental conceptions of equity jurisprudence." The courts of this state have held similarly. Justice Cooley wrote for a unanimous Court in *Rust v. Conrad*:

> [I]f there are any indications of overreaching or unfairness on [an equity plaintiff's] part, the court will refuse to entertain his case, and turn him over to the usual remedies.
>
> ***

The *Stachnik* Court aptly described the scope and purpose of the clean hands doctrine as:

> "a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, *however improper may have been the behavior of the defendant.* That doctrine is rooted in the historical concept of the court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith. This presupposes a refusal on its part to be 'the abettor of iniquity.'

Further, relevant to the instant case, the clean hands doctrine has been applied to deny equitable relief to parties to a fraudulent contract:

> If a contract has been entered into through fraud, or to accomplish any fraudulent purpose, a court of equity will not, at the suit of one of the fraudulent parties,- *a particeps doli,*-while the agreement is still executory, either compel its execution or decree its cancellation, nor after it has been executed, set it aside, and thus restore the plaintiff to the property or other interests which he had fraudulently transferred.

*Rose v. National Auction Group, Inc.*, 466 Mich. 453, 462-64 (2002) (emphasis in original) (internal citations and footnotes omitted).

Defendants contend that Plaintiff has "unclean hands," because he purportedly founded Iconma in express violation of his non-compete agreement with RCM. Per Defendants, Plaintiff and Yalamanchili had an express agreement that they would falsely list George as the owner and CEO of Iconma in order to hide the true ownership of the company from RCM.

Plaintiff responds that RCM had defaulted on its agreement with him by failing to pay his $2 million earn-out ($1 million of which purportedly would have gone to Yalamanchili).

Furthermore, Plaintiff argues that the decision to place George at the head of Iconma was essentially a joint decision between Yalamanchili and him. In essence, Plaintiff contends that the record demonstrates that he had good cause to believe that RCM had violated his agreement, so he was free to pursue other business opportunities.

Viewing the evidence in the light most favorable to the non-moving party, the Court concludes that Plaintiff has come to court seeking equitable relief with unclean hands. Plaintiff explicitly admitted that he and Yalamanchili decided to list George as the owner of Iconma in order to avoid violating his non-compete agreement with RCM. Yalamanchili was not subject to the non-compete agreement. At his deposition, defense counsel asked Plaintiff why he and Yalamanchili decided to make George the owner and CEO of Iconma. (Potluri Dep. 325). Plaintiff responded, "We didn't want to take a chance." (Id.) When defense counsel pressed Plaintiff to explain further, Plaintiff said: "Of, uh, violating any of the agreements with RCM or, or course, RCM also defaulted on the earn-out, so we didn't want to take any exposure with RCM. (Id.) Defense counsel also asked Plaintiff whether he and Yalamanchili had an agreement to falsely list George as the owner and CEO of Iconma when he and Yalamanchili were the true owners, and Plaintiff answered, "Yes." (Id.)

Because Plaintiff purposefully misrepresented the true ownership of Iconma in order to circumvent his non-compete agreement, he cannot now seek equitable relief from this Court. Plaintiff entered into an agreement with Yalamanchili to accomplish a fraudulent purpose: to disguise their ownership interest in Iconma in order to create and build businesses to compete with RCM. Irrespective of Yalamanchili's involvement or whether RCM breached the non-compete agreement, Plaintiff knowingly misrepresented his ownership interest in Iconma to enable the

creation of a business in direct competition with RCM. Plaintiff's misconduct, therefore, bars his equitable claims as a matter of law. *See Rose*, 466 Mich. at 464.[1] Accordingly, the Court grants summary judgment to Defendants on Plaintiff's promissory estoppel (Count II) and unjust enrichment (Count VI) claims.

## 2. Breach of Contract Claim

Yalamanchili contends that summary judgment is appropriate on Plaintiff's breach of contract claim because the alleged contract: (1) fails for indefiniteness; (2) violates Michigan public policy; (3) violates the statute of frauds; and (4) violates the Michigan LLC Act.

Yalamanchili's brief in support of his motion for summary judgment focuses on the alleged June 1996 conversation between Plaintiff and Yalamanchili, where they discussed "work[ing] together for the rest of [their] lives." (Potluri Dep. 65-66). Based on this sole conversation, Yalamanchili attacks the contract on a variety of fronts. First, Yalamanchili argues that under Michigan law the alleged agreement does not contain the "essential terms" concerning the subject matter of the agreement and time for performance. Second, Yalamanchili maintains that the alleged contract – by installing George at the sole member of Iconma – violated public policy in its attempt to defraud RCM, Plaintiff's other creditors, and the IRS. Lastly, Yalamanchili claims that the lack of a signed writing granting Plaintiff an ownership interest in Iconma violates Michigan's statute

---

[1]        To the extent that Defendants argue that Plaintiff defrauded two "third parties" – Narayanasami and the IRS – neither contention mandates summary judgment at this phase. Defendants argue that during the previous litigation with Narayanasami, Plaintiff failed to disclose in his interrogatory responses that he had an interest in Iconma. Plaintiff responds that the interrogatory requested information regarding Plaintiff's "present employers," and that not only did Plaintiff provide this information, but also filed concurrent objections to the allegedly broad scope of the interrogatories themselves. (Pl. Br. Ex. 24, Interrogatory Responses). Furthermore, to the extent that Plaintiff did not disclose to the IRS his 50% interest in Iconma, Plaintiff responds that: (1) Defendants have not cited any IRS rule or statute violated; and (2) he did not derive income from Iconma to warrant a declaration to the IRS.

of frauds and LLC Act.

Plaintiff responds that the relevant agreement the 1996 agreement was further supplemented by the particular agreement the parties made in May 2000. At that time, Plaintiff testified that the oral agreement specified that Plaintiff would develop the AlbionOrion business, while Yalamanchili would focus his efforts on Iconma – with both retaining a 50% interest in each other's business. Plaintiff points to five factual bases for the existence of an enforceable agreement: (1) the testimony of Mandalapu, CEO of Procon and an Iconma client, who stated that he met with Plaintiff and Yalamanchili to discuss the formation of Iconma and believed that both owned Iconma; (2) the testimony of Murphy, who had been retained to assist the AlbionOrion sale, that he believed that Plaintiff and Yalamanchili were partners in both Procon and Iconma; (3) Plaintiff's 1998 payment to Yalamanchili of 50% of the proceeds of the sale of Procon; (4) Plaintiff's $400,000 payment in Yalamanchil from the sale of AlbionOrion, even though Yalamanchili was not a shareholder of record; and (5) Plaintiff's various efforts of behalf of Iconma, in the form of interviewing potential employees, assisting in Iconma's reponses for proposals from customers, attending meetings, providing leads, backoffice support, and helping to expand Iconma's business in other markets.

a.      Indefiniteness

Yamanchili argues that the 1996 and 2000 agreements fail for indefiniteness because the agreements neither identify the subject matter of the contract nor the time of performance. Plaintiff responds that the alleged agreement definitely identified the following: (1) that Plaintiff and Yalamanchili would be equal owners of both AlbionOrion and Iconma; (2) Plaintiff would develop AlbionOrion, while Yalamanchili would focus upon Iconma; and (3) the time for performance was apparent since both individuals began working on their respective projects soon after the agreement.

"Michigan case law does not favor the destruction of contracts due to indefiniteness. Where the time of performance is indefinite, performance may be required to be rendered within a reasonable time. What constitutes a 'reasonable time' depends upon the facts and circumstances of the case[.]" *Soloman v. Western Hills Development Co.*, 88 Mich. App. 254, 257 (1979). Furthermore, "uncertainty may be removed by subsequent acts or agreements of the parties[.]" *Band v. Hazel Park Development Co.*, 337 Mich. 626, 628 (1953).

The Court finds that Yalamanchili has not demonstrated as a matter of law that the alleged contract fails for indefiniteness. Plaintiff testified that the terms of the oral contract discussed the subject matter (AlbionOrion and Iconma) and that both of them began working on their respective business entities shortly thereafter (time of performance). Thus, at the very least, there is a question for the jury as to whether the oral agreements were sufficiently definite to form a contract.

b.     Public Policy

Yalamanchili next argues that the subject matter of the alleged contract is improper and, therefore, violates public policy and, as such, is unenforceable. Public policy may only be used as a basis to void a contract provision where the policy in question is "clearly rooted in the law" as "reflected in our state and federal constitutions, our statutes, and our common law." *Terrien v. Zwit*, 467 Mich. 56, 66-67 (2002). Yalamanchili has not identified any constitutional or statutory provision or common principal as a basis for the public policy he purports that the contract violates. Yalamanchili's vague and cursory argument that the contract violates public policy because the contract's purpose was to perpetrate a fraud on RCM, Plaintiff's creditors and the United States government is factually and legally unsupported. In fact, the contract's purpose, viewing the evidence in favor of Plaintiff, the non-moving party, was to be equal owners of Iconma.

Yalamanchili's argument that the contract's purpose was to perpetrate a fraud is conclusory and without merit at this point in the proceedings. Summary judgment is, therefore, denied.

c.      Statute of Frauds

Yalamanchili also argues that the alleged contract violates the statute of frauds. The statute of frauds bars a contract that is not in writing and cannot be performed within one year. Mich. Comp. Laws § 566.132; *Dumas v. Auto Club Ins Ass'n*, 437 Mich. 521, 533-534 (1991). In this case, Plaintiff testified he and Yalamanchili agreed to form Iconma, and to be equal owners of the company. This agreement could be performed within one year. Plaintiff claims that he and Yalamanchili discussed forming Iconma in March 2000; Iconma came into existence on April 14, 2000, when its LLC articles of incorporation were filed. (Potluri Dep. 144; Iconma Br. Ex. G). The agreement, therefore, does not violate the statute of frauds.

Yalamanchili also argues that the agreement violates former Mich. Comp. Laws § 440.1305, which required that agreements for the sale or transfer of securities to be in writing. Under Michigan law, a security is defined as:

> 'Security' means any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; collateral-trust certificate; preorganization certificate or subscription; transferable share; investment contract; voting-trust certificate; certificate of deposit for a security; certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under such a title or lease; or, in general, any interest or instrument commonly known as a 'security', or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. 'Security' does not include any insurance or endowment policy or annuity contract under which an insurance company promises to pay money either in a lump sum or periodically for life or some other specified period or a commodity contract.

Mich. Comp. Laws § 451.801(l).

Yalamanchili has offered no evidence showing that the ownership interest that the agreement purportedly created was a security under Michigan law, or any legal support for his contention that an ownership interest in an LLC is generally considered a security. Moreover, it does not appear that the parties' agreement created a security. Thus, Yalamanchili has failed to meet the summary judgment burden with respect to this defense.

d.     Michigan LLC Act

Next, Yalamanchili argues that Plaintiff's breach of contract claim must fail because he is not a member of Iconma LLC. In support of his argument, Yalamanchili cites the section of the Michigan Limited Liability Company Act governing the admission of members to an LLC, Mich. Comp. Laws § 450.4501. Mich. Comp. Laws § 450.4501 states that a person may be admitted as a member of an LLC by signing the operating agreement, by acquiring a membership interest in the LLC or upon unanimous vote of the LLC members. Yalamanchili reasons that because Plaintiff is not a member of the LLC, his breach of contract claim must fail. Yalamanchili's argument fails for a number of reasons. First, Plaintiff is not alleging that he is a member of the LLC. Rather, he alleges that Yalamanchili breached their oral agreement by failing to recognize him as an equal owner in Iconma. Second, neither Mich. Comp. Laws. § 450.4501 nor any other section of the Michigan Limited Liability Act requires owners to be members. In fact, according to Plaintiff, he and Yalamanchili agreed to list George as the only member to avoid conflict with RCM. Third, although the fact that Plaintiff is not a member of the LLC is relevant to deciding whether he has an ownership interest in Iconma, it is not dispositive. A factual question remains as to whether the contract exists, and what rights the agreements confers on Plaintiff. Consequently, summary judgment is denied.

### 3. Equitable Estoppel Claim

At the motion hearing, the parties stipulated to the dimissal of Plaintiff's equitable estoppel claim. Accordingly, the Court enters summary judgment on behalf of Yalamanchili on this claim.

### 4. Fraud / Civil Conspiracy Claim

Yalamanchili and George assert different arguments regarding Plaintiff's fraud claim. Yalamanchili argues that Plaintiff's fraud claim fails because it is based on a future promise, which may not be the basis for a fraud action. George argues that Plaintiff cannot prove that she made any misrepresentations to him.

To prove actionable fraud, a plaintiff must prove: (1) that the defendant made a material representation; (2) that the representation was false; (3) that the defendant knew that the representation was false or that he recklessly made a positive assertion without knowledge of its truth; (4) that the defendant made it with the intention that the plaintiff should act upon it; (5) that the plaintiff acted in reliance upon it; and (6) that the plaintiff suffered injury as a result of his reliance. *Scott v. Harper Recreation, Inc*, 444 Mich. 441, 446 n 3 (1993). Generally, actionable fraud must be predicated on a statement relating to a past or existing fact. *Samuel D Begola Services, Inc v. Wild Bros.*, 210 Mich. App. 636, 639 (1995). However, Michigan also recognizes fraud in the inducement, which occurs when a party materially misrepresents future conduct under circumstances in which the assertions may reasonably be expected to be relied upon and are relied upon. *Id.*

Plaintiff claims that Yalamanchili represented to Plaintiff in 2000 that he was an owner of Iconma, and Yalamanchili knew that his representation was false. Plaintiff further claims that Yalamanchili made the representation to him in order to induce him to rely on the representation and

help build Iconma's business. Plaintiff asserts that he acted in reliance on Yalamanchili's representation and suffered monetary damages as a result. At the time Yalamanchili allegedly made the misrepresentation to Plaintiff, Iconma did not exist. Therefore, Yalamanchili's promise related to future conduct, which is not normally actionable in a fraud claim. However, Plaintiff could succeed under a fraud in the inducement theory. *See Samuel D. Begola Services, Inc.*, 210 Mich. App. at 446 n 3. It is undisputed that, in legal appearance, Plaintiff solely owned Procon and Albion Orion, but, upon the sale of the companies, Plaintiff paid a share of the proceeds to Yalamanchili. Given this past practice, and Plaintiff's testimony that he and Yalamanchili agreed share ownership of Iconma, there is a factual question for the jury regarding whether Yalamanchili made a material misrepresentation to Plaintiff to induce him to act on behalf of Iconma.

Plaintiff's fraud claim against George, however, is unsustainable. Plaintiff acknowledges that George did not make any representations to him, but argues his fraud claim should not be dismissed because George conspired with Yalamanchili to induce Plaintiff's action. In order to recover against George for fraud, Plaintiff must be able to prove the elements of fraud. He, admittedly, cannot do so, and must pursue recovery against George under a civil conspiracy claim.

With respect to Plaintiff's civil conspiracy claim, Defendants argue that it must be dismissed because all of Plaintiff's claims are without merit. Defendants are correct that when a claimant cannot prove a civil wrong underlying his or her civil conspiracy case must be dismissed. *Magid v. Oak Park Racquet Club Assoc, Ltd*, 84 Mich. App 522, 529 (1978) ("An allegation of conspiracy, standing alone, is not actionable."). In this case, it would be premature to grant summary judgment on Plaintiff's civil conspiracy claim because Plaintiff's fraud claim still exists.

     5.     Conversion Claim

Defendants argue that Plaintiff's conversion claim must be dismissed because there is no factual basis for the claim. Defendants specifically argue that Plaintiff cannot show that they converted his ownership interest in Iconma because he does not have a legally cognizable ownership interest in Iconma.

Conversion is "any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *Foremost Ins. Co. v. Allstate Ins. Co.*, 439 Mich. 378, 391 (1992). Although it is true that membership in an LLC is personal property, Mich. Comp. Laws § 450.4504, Plaintiff is not a member of Iconma, LLC. Moreover, at this time, Plaintiff does not have a personal property interest in Iconma. Plaintiff filed the instant action in order to establish his ownership interest. Nonetheless, because Plaintiff does not currently have a legally recognizable interest in Iconma, Defendant could not have converted his personal property. Plaintiff's conversion claim, therefore, fails as a matter of law.

### C.    Yalamanchili's Counter-Claims

Plaintiff contends that summary judgment is appropriate on Count I of Yalamanchili's counterclaim because at his deposition, Yalamanchili expressly denied that he had any interest in any of the specified business entities listed in his counterclaim. Yalamanchili's position is that he never entered into an enforceable agreement with Plaintiff concerning the 50% ownership interest in the business entities – but claims even if such an agreement is found to exist, he should be entitled to 50% ownership interest of Plaintiff's business entities. Plaintiff responds that: (1) Yalamanchili is impermissibly taking inconsistent positions for the purposes of summary judgment; and (2) Plaintiff's allegations involve business entities into which Plaintiff and Yalamanchili entered

"together" – and that Yalamanchili provides no evidence that the enumerated entities in Count I were entered into "together."

Plaintiff's Complaint alleges that the purported oral agreement involved business ventures they entered into together. (Compl. ¶ 11). Plaintiff contends that the agreement only reached the following entities: (1) Procon; (2) AlbionOrion; and (3) Iconma. However, Yalamanchili contends that if the alleged agreement is found to exist, he should be entitled to argue that he should be entitled to an ownership interest in business ventures entered into solely by Plaintiff. (Counter-Claim ¶ 6). However, Yalamanchili explicitly admitted at his deposition that he had no ownership claim to any of the alleged business ventures. (Yalamanchili Dep. 476-92).

Although Yalamanchili may take the alternative positions that there is no enforceable contract, but if found to exist and enforceable, the contract must apply to both parties, Plaintiff is entitled to summary judgment. Yalamanchili stated that he is not entitled to fifty percent of all of Plaintiff's businesses. At Yalamanchili's deposition, Plaintiff's counsel asked:

> Q: Is there a contract between you and Mr. Potluri that requires him to give you a 50 percent interest in all the businesses that he starts after 1996?
> ***
> A: In all his businesses?
> Q: Yes.
> A: No.

(Yalamanchili Dep. 477).

Furthermore, it appears that Yalamanchili's "in the alternative" argument further seeks to modify the terms of the alleged agreement to include business ventures that were not entered into together. Even if the Court were to find that Yalamanchili can allege that the contract terms included "all businesses," Yalamanchili has failed to provide a scintilla of evidentiary support for this contention. Summary judgment, therefore, is entered on Count I of Yalamanchili's counter-

claim.

**D.  Iconma's Motion to Dismiss Under Rule 12(b)(6)**

Iconma argues that it must be dismissed from this suit because Plaintiff did make any affirmative claims for relief against Iconma in the Complaint.  Plaintiff responds that Iconma is proper defendant in this suit under Fed. R. Civ. P. 19 because it is an entity necessary for a just adjudication and to afford the relief sought by Plaintiff.

Upon a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), the Court "must construe the complaint in the light most favorable to plaintiff[ ], accept all well-pled factual allegations as true and determine whether plaintiff[ ] undoubtedly can prove no set of facts consistent with [his] allegations that would entitle [him] to relief." *League of United Latin American Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (citing *Kottmyer v. Maas*, 436 F.3d 684, 688 (6th Cir. 2006)).

Pursuant to Rule 19(a), a necessary, or "required" party is: "a person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction . . . ." Necessary parties must be joined as parties if:

(A) in that person's absence, the court cannot accord complete relief among existing parties; or

(B) that person claims a interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

(i) as a practical matter impair or impede the person's ability to protect the interest; or

(ii) leave an existing party subject to a substantial risk of incurring double, multiple,

or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1).

As Judge Lifland, of the United States District Court of New Jersey, explained in an order denying Iconma's earlier 12(b)(6) motion, Iconma is a necessary party to this suit because Plaintiff is seeking a fifty percent ownership share in Iconma. *Potluri v. Yalamanchili, et. al.*, No. 05-05494, slip. op. at 6 (D. N.J. July 28, 2006). Accordingly, the Court cannot accord complete relief to Plaintiff without Iconma's presence in this lawsuit, thus Iconma is a necessary party. *See* Fed. R. Civ. P. 19(a)(1)(A).

## III. CONCLUSION

For the foregoing reasons, the Court:

1) GRANTS Yalamanchili and George summary judgment on Plaintiff's equitable claims (Counts II and VI);

2) DENIES Yalamanchili summary judgment on Plaintiff's breach of contract claim (Count I);

3) GRANTS Yalamanchili summary judgment on Plaintiff's equitable estoppel claim (Count III);

4) DENIES Yalamanchili summary judgment and GRANTS George summary judgment on Plaintiff's fraud claim (Count IV).

5) DENIES Yalamanchili and George summary judgment on Plaintiff's civil conspiracy claim (Count IV);

6) GRANTS Yalamanchili and George summary judgment on Plaintiff's conversion claim (Count V);

7) GRANTS Plaintiff's motion for summary judgment on Yalamanchili's counter-claim (Count I);

8) DENIES Iconma's motion to dismiss.

SO ORDERED.

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  November 3, 2008

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on
November 3, 2008.

s/Denise Goodine
Case Manager